[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR TRANSFER OF PROSECUTION
 I. FACTUAL AND PROCEDURAL BACKGROUND
CT Page 12415
In the early evening hours of March 10, 1994, an East Lyme police officer was called to the Rocky Neck Connector off Interstate 95 with a report of a person hit by a motor vehicle, lying in the road. Upon arrival, the officer found the body of Anson "Buzz" Clinton who it was later determined had died from multiple gunshot wounds. This defendant, Beth Carpenter, is one of four defendants accused of involvement in the Clinton murder; she has been charged with Capital Felony, Conspiracy to Commit Murder, and Accessory to Murder. The defendant's trial is scheduled to begin on November 13, 2000.
By motion dated August 23, 2000, the defendant moves this court to transfer prosecution from the New London Judicial District to the Bridgeport Judicial District. The defendant claims such move is necessary to assure that her right to a fair trial is preserved. The defendant argues that publicity in this matter has been inherently prejudicial and such a transfer would avoid the appearance of prejudice and impropriety, promote judicial economy, and prevent the possibility of mistrial and/or reversible error.
The State of Connecticut opposes the motion. A hearing commenced on September 12, continued on September 13, September 14, September 20, and concluded on September 27, 2000. During those proceedings the defendant entered over 300 exhibits into evidence which included, among other exhibits, newspaper articles, transcripts from radio broadcasts, videos from television broadcasts and a survey commissioned by the defendant and conducted by the University of Connecticut Center for Survey Research and Analysis. The defendant called a total of fifteen witnesses. This court has carefully reviewed all of the exhibits and reviewed its extensive notes from the oral testimony offered at the hearing. As a consequence of said review, this court concludes that the defendant's motion should be denied.
 II. APPLICABLE LEGAL PRINCIPLES
Practice Book Section 41-23 provides, in pertinent part, . . . the judicial authority may order that any pending criminal matter be transferred to any other court location: (1) If the judicial authority is satisfied that a fair and impartial trial cannot be had where the case is pending." Our case law in Connecticut specifies that it is up to the defendant to prove that she can not otherwise receive a fair and impartial trial. State v. Townsend, 211 Conn. 215, 224 (1989). The court is required to balance the rights of the defendant and the community. "This is both for the convenience of the parties, and so that the community in which the crime took place can observe the criminal justice process firsthand. This consideration is not to be taken lightly, but . . . CT Page 12416 must yield, where necessary, to the defendant's right to a fair trial."State v. Reynolds, 199 Conn. Sup. 5996 (1994). The court must also recognize the first amendment right of a free press to observe and publicize criminal trials. Globe Newspaper Co. v. Superior Court,457 U.S. 596 (1982). "It follows naturally that the public will hear and read reports of such proceedings. Dissemination of such information and the accompanying publicity itself, therefore, is not constitutionally objectionable. Extensive publicity implicates the defendant's due process rights only if it rises to a level sufficient to preclude a fair trial for the accused." State v. Crafts, 226 Conn. 237, 257 (1993). It is clear then that the amount of publicity is not the measure, but the content of the publicity must be considered.
The defendant claims that the pretrial publicity is inherently prejudiced and that such publicity makes a fair and impartial trial in the New London Judicial District impossible. Since the defendant claims inherent prejudice, she need not show actual prejudice, if she can establish ". . . an extreme circumstance where there has been inherently prejudicial publicity such as to make the probability of prejudice highly likely or unavoidable." State v. Townsend, supra at 225. See also Statev. Piskorski, 177 Conn. 677 (1979). She must, however, establish that "extreme circumstance" by demonstrating that the publicity is ". . . so inflammatory or inaccurate that it create[s] a trial atmosphere "utterly corrupted by press coverage,'" Murphy v. Florida, 421 U.S. 794, 978
(1975), akin to a trial ". . . likely conducted amidst a circus-like atmosphere . . . inconsistent with the ends of justice." State v.Piskorski, supra 686-689.
 III. EXAMINATION AND DISCUSSION OF THE EVIDENCE PRESENTED
A. PRINT MEDIA AND CIRCULATION IN NEW LONDON COUNTY
It should be noted at the outset of the court's analysis of the print media that a large number of articles reviewed by the court were repetitive in nature, restating information which had been previously reported.
1. Articles for the New London Day
Robert Lequear testified for the New London Day that the average weekly paid circulation of The Day in New London County is 39, 190 copies or 43.02 percent of the 91, 100 total occupied households. (Exhibit 25) The average Sunday paid circulation of The Day in New London County is 44, 264 copies or 48.59 percent. The court concludes that The Day has extensive circulation in the county.
CT Page 12417 The defendant submitted Exhibits 17a thru 24e and 56a — 56d, which consisted of a total of 61 news articles about the murder or the involved parties.[1] Five articles were published in 1994, the year the murder took place. All five articles are straightforward and contain information about the deceased, his family (including an account about the Clintons' reimbursement suit for property improvements), and the police's continued investigation. Four articles were published in 1995, the year the first arrest was made of two of the codefendants, Mark Despres and Joseph Fremut. One of the five articles deals with codefendant Haiman Clein and his eluding the police at that time. The four other articles are straightforward and factual, and even their respective headlines are innocuous. One of the articles (Exhibit 18d) is the Essex community's reaction to the arrests of Despres and Fremut, and all of the people quoted in the article considered these arrests to be a complete surprise. Seven articles were published in 1996, one of which again related to the Clintons' property dispute in Old Lyme. Four of the six remaining articles deal with Clein's return to Connecticut subsequent to his arrest in California. These articles consist of factual, straight reporting with neither the text nor the headline inflammatory or sensationalized. The remaining two articles cover the presence of Despres' son at the murder scene and the civil lawsuit brought by the Clinton family against the three then arrested co-defendants. These
articles are consistently factual and straightforward also.
Eleven articles were published in 1997. One simply mentions this case in an article that focuses on the Eastern District Major Crime Squad and its job. of the remaining ten articles, one involves the civil lawsuit filed by the Clintons against three of the defendants, one deals with Despres' guilty plea, one covers Fremut's rearrest for possession of a firearm, and two are about Haiman Clein: one involving ethics violations as an attorney and the longer of the two concerns his guilty plea. The reporting in each continues to be factual and even the headlines remain factual.
The other five 1997 articles concern the arrest, proposed extradition, and background on Beth Carpenter. Aside from some short and emotional personal comments by the deceased's mother, Dee Clinton, the remainder of the text continues to be factual, consistently straightforward, and not inflammatory.
Fourteen articles were published in 1998. Beth Carpenter's case is briefly discussed in an article which summarized the top news stories in the region for 1997. A second article from that year concerns Despres' motion to withdraw his guilty plea which was denied. Five articles deal with Haiman Clein, one documenting the forfeiture of his law license in CT Page 12418 Middlesex Superior Court and four concerning his motion to reduce bond. While the latter articles contain some quotations by members of Survivors for Homicide, the comments, while somewhat emotional, are not construed by this court to be sensational in any way. In sum, all of the aforementioned were reported factually with similarly factual headlines.
Three articles, including one editorial, involve Dee Clinton, mother of the deceased. The editorial concerns Mrs. Clinton's perspective on the death penalty which really is irrelevant to this case, since the state is not seeking the death penalty against any of these defendants. Two articles deal with Survivors of Homicide, a nonprofit volunteer group that advocates for victims' rights and of which Ms. Clinton is an active member. Nothing in these articles is prejudicial to the defendant.
The last four articles from 1998 are about Beth Carpenter's extradition from Ireland and the status of hearings there. All articles again are factual and noninflammatory.
A total of fifteen articles were published in 1999, one of which mentions Haiman Clein as a former client in an article about Attorney F. Mac Buckley, which is otherwise unrelated to this case. A second article centers on Mrs. Clinton and her involvement planning an ecumenical service for victims of crime. None of the defendants are mentioned or alluded to in this article. A third article concerns defendant Despres' motion to withdraw his guilty plea and while it does resummarize the case as it relates to all the defendants, there is neither anything new nor sensational in the reporting.
Of the remaining twelve articles, three deal with Ms. Carpenter's waiver of extradition, in which her defense counsel, Attorney Hugh Keefe, is quoted extensively, and her bond hearing in the New London Judicial District. One of the articles does portray Ms. Carpenter as a "fugitive" and the court is aware that defense counsel feel that is a misrepresentation. That issue will be for the trier of fact to determine at trial. Part of that article consists of quotations from Mrs. Clinton which reflect her opinion about Ms. Carpenter's return to this area. Some of the comments are emotional, which is understandable in light of Mrs. Clinton's loss, but her sentiment about the case is summed up in her own quotation which is unbiased: "I have faith in the system." Two other articles involve the bond hearing and Attorney Keefe's numerous comments in which defense counsel claims that the state's case "weak" and his client is being mistreated in prison and her health is slipping. In fact, these comments by Ms. Carpenter's own attorney are the articles' headlines. The remainder of the information in the two articles is factual and again, straightforward.
CT Page 12419 The last seven articles from 1999 center on the hearing in probable cause. Information in some of these articles may be construed as shocking, but it is nevertheless accurate and factual as it quotes the testimony of Haiman Clein, the state's key witness in this hearing. In all of these articles, the most sensational language comes from defense counsel Keefe himself in describing defendant Clein as a "liar, a cheat, a thief, and a scumbag". That Attorney Keefe is entitled to his opinion is unquestioned, but he cannot make the headlines and then claim that his client is prejudiced by them. One of these editorials, written by columnist Steven Slosberg. features young Suzanne Clinton, sister of the deceased. Her personal quotations are emotional, but do not rise to the level of outrage. In fact, Miss Clinton is even quoted as feeling "sorry for him" in reference to Clein who is unable to see his children.
In 2000, as of the date of this hearing, five articles were published. One is information on violent crime in America and this case is briefly and factually mentioned. Two articles deal with scheduling of this case for motions and trial. A fourth article comments on new amendments to Connecticut's Victims' Rights Bill. Mrs. Clinton is quoted in the article, but never mentions this case in her remarks. Finally, there is a letter to the editor regarding victims' rights. Her letter never once mentions this case. If the newspaper had not printed below the letter and referenced Mrs. Clinton's son's murder in 1999, there would be no apparent connection between the writer and this case.
The court concludes that despite The Day's extensive circulation in this judicial district, the majority of the reporting was factual. In total, there were an average often articles printed over six years, not a number the court would interpret as extensive.
2. Articles from the Norwich Bulletin
Keith Fontaine, a representative of the Norwich Bulletin testified that the average paid circulation for the weekly Bulletin in New London County in 1999 was 18,016 out of 91,000 estimated households or 19.7 percent. The average paid circulation for the Sunday Bulletin in 1999 was 22, 210 or 24.38 percent. (Exhibit 43f) Those numbers have decreased somewhat since 1994. (Exhibits 43a — 43e) He further testified that the majority of the paper's distribution is in Norwich and towns north of Norwich. In New London, there is no home delivery and an average of 271 copies are sold in New London daily.
A total of thirteen articles were published in the Norwich Bulletin
from 1994 through 2000 (Exhibits 42a through 42n; Exhibits 42c and 42 fare duplicates) either directly involving this case or people involved in this case. There are two short, factual articles from 1994 reporting CT Page 12420 the murder and the reward offered following the murder. One short article was printed in 1995 concerning the arrest of Mark Despres which is reported in a factual and straightforward manner. Three short articles were printed in 1996; two concern Clein's probable cause hearing and one is about his attorney's challenge to Connecticut's death penalty statute. There is no sensational or prejudicial language in any of these articles.
In 1997, there were three articles printed. In one, defendant Clein pled guilty; in a second and third, both of which were quite short, Ms. Carpenter's arrest in Dublin and proposed extradition hearing were reported. There is nothing but factual information in all three of these articles.
Two articles appear from 1998. Both pertain to Ms. Carpenter's extradition proceeding in Ireland. Again, both are very brief and completely factual. One article was published in 1999 and it reported the extradition of Ms. Carpenter and her waiver of same. At the time of this hearing, one article had been published in the year 2000. It reported the first day of this hearing on the Motion to Transfer Prosecution and consists of factual reporting of witnesses who testified that day.
The court concludes that the Bulletin does have fairly extensive circulation in New London County, especially in the county's northernmost towns. The court further concludes that thirteen articles over six years does not characterize high profile coverage of the defendant's case.
3. The Hartford Courant
Between June 4, 1994, and July 19, 2000, the Hartford Courant
published 52 stories regarding this case or people involved with this case. (Exhibits 45b through 45aaa) Michael Vortherms, an employee of the paper, testified by reference to an audit report (Exhibit 44) that for the twelve-month period ending March 28, 1999, there were 93, 300 households in New London County. In this county, the paid daily circulation was 5, 736 and the paid Sunday circulation was 9, 868 or 6.1% and 10.5% respectively of the available households. The court concludes from these circulation figures that the Courant is not widely read in this county. Accordingly, while the court did read each of the 52 articles published in the Courant during this time period, the court does not feel it is necessary to comment on each and every one as it did with the print media which primarily covers New London County.
After a full review of all the Courant articles, the court concludes that the overwhelming majority are factual recitations of the events beginning with Mr. Clinton's murder (Exhibit 45aaa) up to the present CT Page 12421 time regarding defendant Carpenter's Motion for Transfer of Prosecution, the last article presented to the court as published. (Exhibit 45b) Some of the articles do contain quotations from Clinton family members and comments from the mother of defendant Despres. Some of these comments are emotional; none of the comments rise to the level of outrageous or highly prejudicial. Many of the articles are drawn from the AP wire and almost precisely duplicate other articles in evidence. Some of the articles were published in editions of the paper which are not even sold in New London County.
4. The New Haven Register
Between January 19, 1999, and February 11, 2000, the New HavenRegister published 32 stories regarding this case. (Exhibits 51b — 51v) It should be noted that some individual exhibits contain multiple articles.) By affidavit of Jack Kramer, editor of the New HavenResister, 90 newspapers are distributed daily in New London County, primarily in Old Lyme, Connecticut. Based on a previously cited figure of 93,300 households in New London County, the New Haven Register is read by substantially less than 1% of households in this county. Based on this percentage, this court does not find it necessary to conduct an article-by-article analysis. The court did, however, read all 32 articles. The articles commence in January. 1996, with the appointment of a Special Public Defender for the defendant, Mark Despres (Exhibit 51v) and conclude with an article dated February 11, 2000 (Exhibit 51p) concerning scheduling of the case. The overwhelming majority of the articles are factual, tracking the various court proceedings of each of the defendants. In one article (Exhibit 51s), Mrs. Clinton is quoted and is emotional upon hearing that Ms. Carpenter would be extradited from Ireland. Mrs. Clinton expresses her happiness at the fact that Ms. Carpenter was returning to the United States. In another article from June 8, 1999 (Exhibit 51d), both Supervisory Assistant State's Attorney Murray and defense attorney Keefe are quoted about the extradition. None of these comments, in the court's opinion, despite the personal spin of each speaker, borders on prejudicial.
5. The Pictorial Gazette
 The Pictorial Gazette, an Old Saybrook publication, published two articles about this case: one on June 12, 1999, and a second on August 30, 1999. (Exhibits 50b, 50c) Both were primarily factual and reported in a straight forward manner. In the earlier article, Mrs. Clinton is quoted as "thrilled" that Ms. Carpenter is being extradited, but again, there is nothing accusatory in Mrs. Clinton's statement. According to a stipulation by all counsel, the paper's circulation is 1,084 households in New London County, all with Old Lyme zip codes. The court finds this CT Page 12422 distribution to be approximately 1.16% of the 93,300 households in this county. In fact, the publishing site, Old Saybrook, is not even in New London County.
6. The Willimantic Chronicle
Between February 6, 1996, and July 19, 2000, six articles appeared in the Willimantic Chronicle about this case. (Exhibits 49b-d, f-h) All of the articles appear on the inside of the paper, are relatively short and factual. The Chronicle is published six days per week and distributes 727 copies in New London County, all in the county's two most northern towns, Lebanon and Franklin. Based on 93,300 households in New London County, the Chronicle is distributed to less than 1% of all New London households. Accordingly, this court finds in light of such minor distribution that any articles published in the Chronicle have virtually no effect on the potential jury pool in New London County.
7. Main Street News
The Main Street News, a weekly publication, printed four articles about this case between March 24, 1994, and March 31, 1999. (Exhibits 33a — 33d) All are factual; two deal with Mrs. Clinton's activities with Survivors of Homicide and specifically do not discuss this case. Carolyn Gilbert, a member of the paper's editorial staff, testified that 2, 500 issues of its weekly are distributed in New London County, all in Lyme and Old Lyme. Based on 93,300 households in the county, the distribution is about 2.6% of all households. Accordingly, the court finds the reporting to be accurate an4 the paper's distribution to be so minimal as to have no effect on potential jurors.
8. Associated Press
There were 43 articles from the Associated Press wire beginning in late 1995 and concluding in July, 2000. (Exhibits 52a — 52qq) Several articles are duplicates as they were sent out over the wire at different times on the same day. All that is certain is that each of these wires was available in New London County. There is no exhibit nor was there any testimony to make this court conclude which, if any, of these wires was used in print media distributed in New London County. The court did read and review all 43 articles. All of the articles are factual recitations of the proceedings against all four defendants. None of them contain any statements or quotations which the court finds exceptionally outrageous or prejudicial.
9. Connecticut Law Tribune
CT Page 12423 Twenty-five articles have been published in the Connecticut LawTribune beginning in January of 1996 and concluding on April 3, 2000. (Exhibits 26a — 26y) Vincent Valvo, the publisher and editor of theTribune, testified that the weekly paper is distributed through subscription only. Its total distribution in New London County is 88 papers or about 3.5% of the paper's total distribution. (Exhibit 27) Thus, based on 93,300 households in New London County, the Tribune is distributed to substantially less than 1% of New London households. The court reviewed all 25 articles. of all the print media, the Tribune's
articles contain the most graphic language and numerous quotations by respective counsel which can best be characterized as "grandstanding". Despite this, the majority of the articles are factual. In light of that and the minimal distribution of this publication in New London County, the court finds that these articles are not prejudicial.
B. ELECTRONIC MEDIA AND COVERAGE IN NEW LONDON COUNTY
1. WLIS/WMRD Radio Stations
WLIS broadcasts out of Old Saybrook and WMRD broadcasts out of Middletown; both stations' signals cover part of New London County. (Exhibit 1) Both stations broadcasted a total of five stories involving the Clinton murder between June, 1999, and February, 2000. (Exhibits 2-6) The longest piece is eight sentences. All five articles are factual and straightforward. There is nothing prejudicial in the reporting. The court concludes that five broadcasts over the past six years, the length of time since the death of Anson Clinton III, hardly constitutes high profile coverage.
2. WCTY/WNLC/WKNL/WICH Radio Stations
James Reed, the vice president and general manager for WCTY, WNLC, WKNL, and WICH testified that all four stations have coverage in New London County. (Exhibits 34a — 34d) According to audience data (Exhibits 36a — 36e), about 89,000 people are likely to sample one of the four stations at any given time Monday through Sunday. This includes all listeners age 12 and older. (Exhibit 36a) Mr. Reed stated that none of the stations are primarily news stations, but rather broadcast news on the hour or half hour. Since 1994, eight stories pertaining to the Clinton murder have been broadcast, and all were taken from an AP wire. Four of these broadcasts dealt with this hearing to transfer the case out of the New London Judicial District. The other four broadcasts dealt with Beth Carpenter's return to the United States and her probable cause hearing. The court has read the scripts for all eight broadcasts and finds them all factual and devoid of prejudicial comments or quotations. CT Page 12424
3. Channel 8, WTNH
Anthony Marinaro, Jr., a representative from Channel 8 testified that Channel 8 is watched more than any other station in New London County. Newscasts are traditionally broadcast at 5:00 P.M., 5:30 P.M., 6:00 P.M., and 11 P.M. The station estimates that there are 90,040 television households in New London County. This number has been relatively stable since 1994. (Exhibit 31 a) An average cumulative share of viewership for the 6:00 P.M. news, Monday thru Friday, is a 22 share which is about 10,000 television households. (Exhibit 31 a) As Mr. Marianaro testified, there are no guarantees that those individuals whose televisions were turned on were actually watching them at any given time.
Between March 11, 1994, and July 19, 2000, Channel 8 aired 19 separate stories for a total of 36 airings as eight stories were aired multiple times. (Exhibit 30) The court has reviewed fifteen news stories retrieved from Channel 8's website (Exhibits 29a — 29o) and 66 scripts from broadcasts. (Exhibits 32a — 32nnn) There is one comment in one broadcast regarding Ms. Carpenter's return to the United States which is a quotation from Mrs. Clinton which is prejudicial: "I do believe there is good and evil in this world, and I believe that . . . um . . . she belongs to Satan." (Exhibit 29g) Clearly this is a highly charged statement, but when pressed later in the same newscast about Ms. Carpenter, Mrs. Clinton responds: "I left it to the authorities; it's beyond my control." Despite the nature of this statement, and in deference to the fact that Mrs. Clinton is clearly grieving over her murdered son, the court does not feel that this isolated remark will adversely affect any potential jurors who may have watched that broadcast on Channel 8. Aside for this one comment, all other scripts and newscasts are straight forward and factual.
This court also viewed the videotapes of broadcasts supplied by the network. (Exhibits 28b and 39) The tapes cover time periods between February 5, 1996, and July 19, 2000, and involve eight broadcasts. The majority of the tapes are repetitive covering either Clein's return from California or Carpenter's return from Ireland. Much of the tape is silent as the video portion ran as background to a script read by a reporter. The news clips do show Clein in handcuffs and leg irons as he is being escorted from the airport and Carpenter as she is being transported from the state police barracks. There is also a clip of the Clinton family holding a sign "Welcome Home, Beth". While these clips may be deemed graphic, they are factual and minor in number to the remaining innocuous broadcasts by Channel 8.
4. Channel 30, WVIT CT Page 12425
William Nardi, the News Operations and Production Manager for WVIT, Channel 30, submitted by affidavit one videotape containing all television broadcasts involving this case between March 9, 1994, and the present. (Exhibit 41) This court's analysis is similar to its analysis of the Channel 8 tapes: much is silent, much is repetitive, and most deal with the return of Clein and Carpenter to Connecticut. Accordingly, the court does not find these broadcasts to be overly prejudicial and finds them to be minimal in number over the past six years.
C. THE SURVEY
Defense counsel commissioned a Change of Venue Survey through the Center for Survey Research and Analysis at the University of Connecticut. (Exhibit 8) Christopher Barnes, Assistant Director of the Center (Exhibit 7), testified about the results. The survey set out to determine the level of awareness of the Clinton murder in New London vs. Bridgeport. Bridgeport was selected because it is in a different geographic media market than New London. A total of 401 individuals were surveyed in New London County and 402 individuals were surveyed in Bridgeport County.
The court finds the results of the survey support retaining this matter in the New London Judicial District for trial. When New London residents were asked whether they had heard of or read about Beth Carpenter, only 20% in New London had heard or read about her compared to 4% in Bridgeport. As to the same question regarding Haiman Clein, again only 20% in New London had heard or read about him compared to 3% in Bridgeport. The same question was asked in relation to Anson "Buzz" Clinton and again, 20% in New London had heard or read about him compared to 5% in Bridgeport. In sum. 80% of potential jurors in New London County had neither heard of or read about Beth Carpenter, Haiman Clein, or Anson "Buzz" Clinton.
It is true that when more information about the specifics of the case was provided to the survey participants, the familiarity with this case rose dramatically: 83% in New London compared to 13% in Bridgeport. This is not surprising since the murder took place in New London County and the deceased lived in New London County.
What the court finds most telling is the answer to questions which go to the very heart of the defendant's claim that she can not get a fair trial in New London County. When asked: "If you were a juror for a trial of Beth Carpenter and were asked to forget anything you knew or had been told about the case, how easy or difficult would it be?", 68% of New London County participants said it would be easy or somewhat easy to do CT Page 12426 so compared to 61% of Bridgeport County residents. When asked: "If the defendant does not testify, is she guilty?", 29% of people surveyed in Bridgeport responded "yes" compared to 24% in New London. Finally when asked: "Do you think Beth carpenter is guilty, probably guilty, probably innocent, or innocent?", 79% of New London people surveyed had no opinion; only 5% felt she was guilty compared to 2% in Bridgeport.
The court's review of the survey concludes that the majority of the residents of this judicial district can be fair and impartial to Beth Carpenter. In many instances, they can be more neutral and less predisposed than their counterparts in the Bridgeport Judicial District.
D. THE CARPENTER/CLEIN/CLINTON NEXUS TO THE COMMUNITY
The defense presented evidence during the course of this hearing contending that it would be impossible for Beth Carpenter to get a fair trial in the New London Judicial District because of her connection, Clein's connection, and the Clinton family's connection to this community. This nexus argument was virtually abandoned by defense at final argument on this motion; however, since much time was devoted to it during the course of this proceeding, the court will address it.
Haiman Clein was questioned extensively as to his ties to New London County. Mr. Clein had a law practice in Connecticut from 1978-1995. Aside from a short period of time (1992-1994) when he had an office in New London, he practiced out of Old Saybrook which is located in the Middlesex Judicial District. His practice was mainly an office practice and the majority of his practice was in Middlesex County. He recalled appearing in New London courts a couple dozen times at most over his seventeen year Connecticut practice. His only personal connection to New London was his membership at Beth El Synagogue in New London. Clein was involved in numerous personal real estate and partnership ventures, many of which ended in foreclosure in the early to mid-nineties. Save for one, he testified that they were all litigated in the Middlesex Judicial District.
Various documents were submitted by stipulation of the parties regarding Beth Carpenter's ties to the New London Judicial District. Ms. Carpenter was an alternate on the Ledyard Planning Commission from February 10, 1994 — April 26, 1995. Ms. Carpenter served on the Ledyard Republican Town Committee from January, 1994 to February 13, 1995. Ms. Carpenter worked as an unpaid volunteer in GA-21's Public Defender's Office for about a year in the early 1990's prior to associating with Clein's firm. She also appeared as counsel for a co-defendant in a case entitled State v. Mary Justice, prosecuted by the New London State's Attorney's office. Her parents filed a visitation suit CT Page 12427 against their daughter, Kim Carpenter Clinton, to gain visitation with their granddaughter. Beth Carpenter was not a party to that suit nor mentioned in it. Neither she nor Clein represented the Carpenters in that action. The court finds Ms. Carpenter's contacts with the New London Judicial District to be minimal and not substantially different from other defendants accused of crimes in New London County who also live and/or work in New London County.
The Clinton family is politically known in the Old Lyme area. Mrs. Clinton testified that both she and her husband unsuccessfully ran for First Selectman at one time. The Clintons own a kennel in town. Mrs. Clinton is an officer and active participant in Survivors of Homicide and acknowledged that she has been vocal in pushing legislative change for victims of violent crime. She testified, however, that she always tries very hard to separate that campaign from this personal case. She also stated that were she asked to abide by certain orders of the court during trial (i.e. not wearing a Survivors of Homicide pin), she would follow those orders. The defense also introduced news articles from the seventies and eighties concerning property disputes the Clintons had with Old Lyme and the Clintons' political involvement in town. (Exhibits 55a — 55q, 56a)
In sum, the purported nexus of both Beth Carpenter and Haiman Clein to the New London Judicial District is minimal at best. The Clintons are well known in Old Lyme and thus, have a stronger nexus to New London County, but not one that in any way prejudices the defendant, Beth Carpenter, from a fair trial in the New London Judicial District.
 IV. CONCLUSION
In accordance with State v. Reynolds, supra, the court has balanced the rights of the defendant and the community, The court concludes that the defendant Beth Carpenter can receive a fair and impartial trial in the New London Judicial District. The court concludes that the publicity to date has not been "inherently prejudicial", see State v. Townsend,
supra, nor so "inflammatory or inaccurate" to "create a trial atmopshere [which will be] utterly corrupted by press coverage." Murphy v. Florida,
supra . . . This court feels that the trial judge can control the trial atmosphere with appropriate orders, and that the defendant will have an opportunity to avoid any potential prejudice through our established voir dire system.
BY THE COURT:
Handy, J.